I should say, just for the public record, that we had another case before this one, United States v. Zimmedia Silva, but that's been submitted on the briefs and records. Thank you, Your Honors. If it may please the Court, and with all good intentions, I hope to reserve five minutes for rebuttal. Sure. I'd like to address two issues today that I believe lead to a requirement to reverse the Bankruptcy Court's decision, but ultimately the District Court's decision, because we're here at a second-level review, and that is dealing with the Bankruptcy Court's erroneous use of a legal standard of using readily ascertainable to deny protection for Masimo's custom care analytics trade secret, and then also, time-permitting, the failure for the Bankruptcy Court to even address a request for reasonable royalties where there was a finding that there was no unjust enrichment or actual damages provable for certain stolen documents. I do not believe that it's any further disputed by the parties that it would be an error for the Bankruptcy Court, or any court, to require a plaintiff in California to prove that in order to qualify as a trade secret, that something must not be readily ascertainable. I think that that has been abandoned by the defendants in this case, by the appellees. In this instance of the Ninth Circuit, that was not argued at the Bankruptcy Court. It was then argued at the District Court to support that after the Bankruptcy Court relied upon that on the finding. Was that the only basis for the Bankruptcy Court's determination? With respect to the, and this is a very important point, I think, and I think if we look at the briefs very carefully, it comes out very clearly. With respect to the actual trade secret at issue before this court, that was the only basis for the finding, and I believe that Sotera admits that in its brief. It talks about there being three different bases for denying trade secret protection, but the trade secrets that are being discussed are not the trade secrets actually at issue. Let me give you a quote from Sotera's brief that I think helps exemplify this. Sotera's brief at pages 22 and 23, it says, the Bankruptcy Court's third ground for decision, and they called it the third ground for decision, but it wasn't a third ground for decision on the same trade secret or the proper definition of the trade secret. It says, the third ground for decision addressed Massimo's insistence, so Massimo was presenting its trade secret under this particular characterization, that its trade secret relating to customized alarm analytics included its knowledge that customization was important to hospitals. This was actually, as the Bankruptcy Court recognized, a recognition of an effective sales technique. It wasn't simply doing analytics on a hospital's data. It wasn't simply doing analytics on one versus many hospitals' data. Well, it seemed to be generally known about analytics in a broader sense, correct? What the court found with respect to just analytics was there was a publication out there which was relied upon heavily by Sotera, which was to say, hey, this is out there in this publication, and in that publication, Massimo had actually published this document twice, was let's take a lot of data from a lot of hospitals and use that to try to convince another hospital to change their alarm settings. Let me just put it this way. So I will acknowledge that I am not an expert in any of this, but when I read what the trade secret was asserted to be, it seemed, you know, the device and what they were trying to market that one might want to look about overall performance and how hospital personnel respond to these alert devices, which seems like, you know, in the broader sense, that type of marketing strategy just be just out there. The district court had actually found that with respect to that Horizons article, there was not a finding that it was just out there. There was a finding that if you went into a hospital, you would learn, you could learn from that hospital that they thought they were unique, right? So the white paper was the same as the Horizons article. It discussed the idea of taking a lot of, it was actually simply a report of a study of a lot of data from a lot of hospitals. It was what? A marketing tool. No, it was not a marketing tool. Well, it was used. Yes, it was used. They told everybody about it. They told everybody about it and what they did and what the record reflected in the findings showed was that they took that large scale study, walked into hospitals, and tried to convince those hospitals to change their alarm settings on the general care floor in order to get them to reduce the number of alarms so that the caretakers could respond, otherwise there was too many alarms. The hospitals, and the findings reflect this, were not receptive to that approach because the big data approach they didn't believe would solve their problem. They didn't believe they fit within the large scale data that was collected at these various hospitals. And so that Horizons article, and in fact the court acknowledged that it wasn't the We can solve your problem. We can solve your problem by running your own data. And not just doing that as part of a device, but doing that as part of the sales process to convince them that this product could work for them. That was the key that Massimo discovered, which was if we do this on this hospital's own data, and we tell them this will allow you to see what would happen on your care floor with your patients, and that you will only have X number of alarms that you can actually handle, it changed the dialogue so that the hospital could now see that they could implement. It seems to me so evident that that's what you should do if you're trying to sell a product to somebody. Say here's how it's going to fix you. Here's how it's going to help you. Now that is an interesting point. That is in effect what the bankruptcy court said. It said anybody could learn that. The problem in the trade secret law in California, and it's different from other states. In California, the language from the trade secret statute that was it's generally known or readily ascertainable was stricken from the statute. And California said we are not going to analyze, like if it was a patent case, if someone could figure it out, or if it was easy to figure out. What the legislature decided in California is we are simply going to look at where did that information come from. These hospitals and their findings were under NDAs. This wasn't like the Burger King ad that the bankruptcy court analogized to where there was an ad run, have it your way. These were private sales. These sales processes go on for a long time, and there are NDAs that are nondisclosure agreements. Sorry for the mnemonic there. There are nondisclosure agreements, so there were confidentiality agreements with the hospitals. And those hospitals, therefore, couldn't just tell others that's how Massimo had gone about selling them. So the premise of your statement is that California did not include the requirement that some information be readily ascertainable. That's not in the statute. But when you said that you included generally known, that the information not be generally known or readily ascertainable, those are two different things. And information that is generally known can't be subject to trademark protection. Are you arguing that California has found that if something's generally known, you can go ahead and trademark it? No. The trade secret law in California does exclude from trade secret protection that the information was generally known and understood, but the bankruptcy court did not find it was generally known. Well, the bankruptcy court really had three reasons for its decision. You've argued the first, whether it was readily ascertainable. Then the bankruptcy court had a technical analysis and determined that after a seven-day trial, that what Massimo was trying to have as a trade secret really wasn't a trade secret, and then that it was published twice in the Horizons magazine, in the white paper, and that it was generally known. So I mean, those articles publish this analytics data just with more information. And so the bankruptcy court was finding that's putting out there what we're doing. The idea is to get these hospitals not to be concerned about alarm fatigue and not respond to alarms. They're worried about that. So this whole notion of the analytics was put out in those articles. So the idea of doing analytics was put into those articles. But that was a separate characterization of the trade secret, simply the idea of doing analytics and what the bankruptcy court then did and what Sotera acknowledges in its briefs, that with respect to the insistence of Massimo, that the knowledge was important to the sale. The bankruptcy court, that came in. Here's a difficulty as well. What you're claiming to be the trade secret is kind of slippery. It seems like it may have been different in the bankruptcy court and before the district court and in your briefs. I don't really, even as we sit here today, understand what it is you claim was the trade secret. Could you just articulate that so we clearly know what it is that's the basis of your claim? Yes. Well, the trade secret was many factors, and the bankruptcy court noted this. After going through those first two reasons that Sotera has identified and that you just The bankruptcy court then stated and acknowledged what Massimo had said, and it's in paragraph 367 of the court's decision at the excerpts, the appellate excerpts of record at 174. It says, in its closing argument, Massimo contended that the Horizons article does not disclose providing analytics to a care location using the care location's own data, using the analytics to persuade the customer to optimize their alarm settings, persuade the customer, giving the customer confidence to buy, it was an effective sales tool, facilitating successful deployment. The fourth point, gathering successful data, is discussed in another section. When the bankruptcy court dealt with that trade secret, that's where the court then two paragraphs later in 369 said providing care locations is reasonably ascertainable and thus not confidential or proprietary. That's where the error occurred with respect to the trade secret that I just articulated, and it also included, she stated in terms of convincing the customer, Massimo had articulated that as knowledge that it was an effective sales tool. Even apart from whether her use of the term ascertainable, which doesn't seem to be consistent with California law, she also said that it's just not a trade secret, period. With respect to the trade secret I just identified, the only stated reason was because it was not readily ascertainable. She wrote a very lengthy opinion. Yes. It put me to sleep, I must say. It's very long, but there were other reasons, and what I gathered from it was this idea, which I didn't mean, when I, my first question, I didn't mean to suggest the white paper or the other study, whatever it was that they published. But just the general idea of using analytics to market this kind of device doesn't strike me as so unique. And then to say it's a trade secret to apply that technique to a particular location, how could that, what is so, what is so distinct about that as apart from the sort of the general idea of using an analytical approach to marketing a device of this kind? Well, that's the point. In the trade secret law, we don't look at in California whether it was, would have been easy to figure out. We simply figure out whether or not that's, whether it has been out there. It is generally known. And the bankruptcy court did not find it was generally known. And I go back to Sotera's brief again because there were not other reasons with respect to this aspect. Well, not so much the method of using it in a hospital, but the use of analytics. So the use of analytics, there was no evidence one way or the other or findings that using analytics in the hospital was generally known. There was evidence that it was published in the Horizons document in the white paper, but not that that was just generally a way of selling the hospitals. But the Horizons report or publication is an industry publication, correct? Yes. And so... So it's generally known in the industry once it's published. And this is significant because if it's generally known, it doesn't have any value as a secret. So that's a separate issue and I do want to reserve some time for rebuttal, but I think there's a very important finding here that addresses these questions, which is what the court found at AER 169 paragraph 337 is that Massimo tried at some point a big data approach. Mr. Welsh published Massimo's results in the industry journal Horizons, but hospitals were not receptive. This is the finding of the bankruptcy court. Massimo eventually realized, this didn't just come overnight, eventually realized that hospitals would respond if it gathered that hospital's data and then applied the same analysis to the individualized data. And very importantly, after Mr. Welsh, the Massimo employee, moved to Sotera, he persuaded them to use these custom alarm analytics when selling Visi. I'd like to... Yeah, I'll give you some time. Okay. Thank you. Ian Shapiro for the appellees, your honors. May it please the court. Let me begin by just addressing two points that came up in the first part. One is that the trade secret was the distinction between retrospective analysis generally and retrospective analysis as applied to one hospital. That's how the court understood the trade secret and that's how it's articulated in the decision. And that's at paragraph 338 and 39 of her decision, AER 169. The second point I want to make at the outset is that the court didn't recognize these other additional aspects of the trade secret as the appellant suggested. The court's discussion in paragraph 367 is a moment where the court says, I found that custom analytics was disclosed in the Horizons article. And in closing, Massimo made, argued a series of distinctions from what was disclosed in the Horizons article. So she was addressing an argument that Massimo made in closing. She wasn't recognizing those four elements as additional aspects of the trade secret. And then she went on to address them. And I do think that the court doesn't need to address readily ascertainable. That was a third and alternative ground for the bankruptcy court's finding. The first two grounds. I don't think you would agree with that. That's not California law. I think it's not California law that it's an element of the definition of a trade secret. I think there are a number of California cases that say you can consider readily ascertainability in considering whether or not information derives independent economic value from being secret. I think it can be an evidentiary consideration. And then there's the comment in the legislative notes about whether or not it's a defense to misappropriation. But as a requirement or an element of the definition, I agree. And so the court first said it's not a trade secret. Bilal Musin was the Massimo witness who was supposed to defend this distinction. We had called the distinction meaningless in our opening brief. And in Massimo's opening statement, they said, we think that distinction's key. That's the crux of this. And Bilal Musin is going to describe to you why that distinction is so important. And the court found that the distinction was nonsensical. And the district court said that that finding was entitled to deference. And I think this panel can find that customized retrospective analysis is not a trade secret on that ground alone. And then the second point that the bankruptcy court made was that even if custom analytics was a trade secret, it was disclosed in the Horizons article. And the court says that in paragraph 366, which is at AER 174. She says the key idea, customized analytics, was embedded in the article. And it's not true that the article merely described a study of aggregated data and made recommendations about alarm thresholds and delays based on that aggregated data. If you read the article, the article is addressed to clinicians. And it encourages those clinicians to set internal policies for given populations based on this kind of automated retrospective alarm analysis. And the Horizons publication that we're talking about was an issue of Horizons. That was published for a conference on addressing alarm fatigue. And all of the articles in the Horizons publication were intended to recommend methods that clinicians could adopt. Let me ask you a question. Why couldn't a sales technique be a trade secret? We're not suggesting that a sales technique can't be a trade secret. I think that's a red herring. But the court found, based on the evidence at trial, that this particular technique wasn't a trade secret, that there was no meaningful distinction between retrospective analysis as applied to a broader or a narrower data set. The evidence seemed to suggest that Sotero got the whole idea from this, from the source of information that was provided to them by the two fellows who came over. So the analytical technique of retrospective analysis was developed by Jim Welsh when he was at Massimo. And he published on that, he was directed to publish on that technique in the White Paper and in the Horizons article. And after having published on it twice, when he came to Sotero, he drew the same... Before he came to Sotero, had Sotero itself initiated that kind of analytical approach without him being at Sotero? No. And not only that, I think it didn't have a commercial... It didn't suggest that you got this information improperly? No. In fact, we embraced the idea that Jim Welsh brought this technique to Sotero. He had published on this technique. And the testimony at trial was that Jim Welsh walked into the office of one of the junior engineers and he drew the grid on the whiteboard, the same grid that's in the Horizons article, available for other clinicians to adopt. All he did was draw the grid and that's it? Nothing else? Yeah. He did all the documents that he brought over? He didn't take a look at them and say, oh, you know... Here's some other strategic methods that you might utilize. The bankruptcy court judge found that there was only evidence of Mr. Welsh only opening four or five, a very, very small number of documents. And with respect to the one document where she thought that the document was a trade secret and that there was some evidence of use, she awarded damages. She actually awarded punitive damages for that evidence of use within his first few days. And ordered the documents destroyed? Yes. And there was a very broad injunction that required Sotero to destroy a whole host of So, and the other point I wanted to make about the Horizons article in the white paper, and this is suggested in the briefing, is given the broad publication of this technique, I think there was no reason for Jim Welsh to know that he was using improper means when he introduced that technique to Sotero. And I think that's an alternative ground for this court to find that there wasn't misappropriation of that trade secret. Because there was no reason for Jim Welsh to think that he couldn't draw on the white board the same grid that was reflected in the Horizons article. If the court would like, the appellant didn't raise it initially, but I was going to address the royalty question next. So Massimo had two claims that were based on the downloading of documents, the mere acquisition of documents. One had to do with customer information trade secrets, and the other had to do with technical information trade secrets. And Massimo, and it is true, the bankruptcy court did get one, the district court got one thing wrong with respect to those documents, which is that the bankruptcy court did find that those documents had been misappropriated because they were downloaded onto hard drives by Welsh and Hunt, and insofar as they were Sotero employees and Welsh had connected his hard drive, the court found that there was acquisition and misappropriation by vicarious liability. But the court, with respect to the customer information trade secrets, Massimo argued made allegations of use with respect to some of that information. And the court addressed those allegations of use, and in certain instances the court found that there was use and awarded damages, and in other instances the court found that either it wasn't a trade secret or there wasn't use. With respect to the technical trade secret documents, Massimo didn't make any allegations of use. They sought damages based on the acquisition alone. And what the court held in its decision was that if there was no use or benefit, then there's no damages. And with respect to the technical trade secret documents, that's at paragraph 168 and 169 AER 141, where the court says that I didn't find that there was any use or actual benefit with respect to the technical trade secret documents, and therefore damages would be inappropriate. And with respect to the customer information trade secrets, the court explains that where there was use, she awarded damages. But with respect to all of the other customer information trade secrets, the balance of the documents, she found that there was no use and no benefit, and therefore there were no monetary damages. And those findings, which Massimo hasn't challenged, those findings are sufficient to encompass their royalty claim, whether or not she specifically addressed the royalty claim in those discussions. She said no damages without any actual benefit or use. And we've cited a number of cases that make that point. The most important of which I think is EJACSO, which says that a royalty is for past or future use, and that when a royalty is appropriate is when there's been valuable but non-measurable benefits. Here, the court found that there was no benefit and no use with respect to the rest of those documents, and that's why she didn't award a royalty. And the same point with respect to use and royalties is made in ALTIVATION, AT&T, and ATLANIC. And the last point I want to make is on reply, Massimo makes an argument about how Sotera had access to the library of documents that Welsh downloaded. There's no evidence in the record that he had access to them. The evidence was that he only opened a very, very, very small number of them. But in any event, that argument about the library of documents, that's an argument that they made to the district court. The district court didn't find in their favor on that argument. They didn't make it in their opening brief on this appeal, and I think it's been waived. And in any respect, the court disregarded the expert testimony addressed to that at paragraphs 168 and 169. Massimo's expert, there was cross-examination at trial where Massimo's expert said that even if the documents were sitting in a draw and no one knew that they were there and no one had ever looked at them, that Massimo should still get damages for that. And the bankruptcy court specifically rejected that testimony and found that it wasn't credible expert testimony. And with that, I'll yield the, unless there are additional questions, I'll yield the balance of my time. I don't think so. Thank you. Very briefly, your honors, I want to just respond to two very small points. First off, it was not just putting that concept on the board. As I mentioned earlier, the bankruptcy court found that Mr. Welch persuaded Sotera to use these custom alarm analytics when selling VZI, and in the record at AER 794, he put together a presentation about using this to sell VZI, and they decided, quote, the presentation is a very good sales tool to talk about Sotera's ability to help our customers with alarm management. This was a presentation put together by Mr. Welch. It was not just saying, hey, let's do alarm analytics. Briefly on the issue of whether or not this was something merely from closing, this wasn't a change of the trade secret that came from closing. The bankruptcy court quoted our trial brief in the findings at AER 171 to 172, paragraph 351, and this was part of the trial brief. Before trial, Welch persuaded Sotera to implement alarm customization process, knowing from his work at Massimo that this technique was an effective tool in convincing and assisting hospitals to alter their alarm policies. That was part of the trial brief. In opening statement, we stated at SAER 0220, this distinction is very, very important and critical to breaking into general floor monitoring in the hospital. It was testified to by the witnesses and then mentioned in closing argument. Thank you. Thank you. Thank you very much, counsel. We appreciate your arguments. The matter is submitted at this time.
judges: Kelly, Paez, Bade